UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| JEFFREY R. WERNER,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BN MEDIA, LLC; and DOES 1 through 50 inclusive,<br><br>　　　　Defendants. | CIVIL ACTION NO.<br><br>2:19-cv-610-HCM-DEM<br><br>DECLARATION OF JEFFREY R. WERNER IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT |

### DECLARATION OF JEFFREY R. WERNER IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

I, Jeffrey R. Werner, declare as follows:

1. I have personal knowledge of the following facts, and if called as a witness, I could and would testify as follows:

2. I am the Plaintiff in the above captioned action and I make this Declaration in support of my opposition to Defendant's Motion to Dismiss the Amended Complaint.

3. I do not recall visiting the Defendant's websites, https://www.beliefnet.com/ or https://www.patheos.com/, nor am I aware of anyone from my agency, Incredible Features, Inc., visiting the websites prior to discovering the infringing uses of my copyrighted works.

4. Over a forty year career as a freelance photographer, working on assignment for numerous magazines and publications and doing my own stories for syndication, I have made a point of always keeping the rights to my pictures.

5. It has also been my business practice to license pictures, even on assignment, one right at a time, for a prescribed time period, based on the circulation of the publication and the size and

number of the photographs used, and the countries/languages they are used in.

6. It is also my policy and the policy of my agency never to give rights away in "perpetuity." To do so would limit the use and life of the works, and their value. This has been a key part of my business practice for decades. Attached hereto as Exhibit A is a true and correct copy of the 1987 article in the Photo District News titled *The Enquiring Mind of Jeffrey Werner*.

7. In late 2013, while working on some projects in Brazil, one of my employees contacted me to let me know that she had noticed a number of my stories were appearing on various media, including websites, video, and electronic media, that we had no record of issuing licenses to.

8. Upon my return in early 2014, we began to look further into the problem through Google searches and third-party reverse image search software, and discovered that the sheer amount of stealing that was going on was much worse than I could have ever imagined.

9. Many of our stories had been infringed all over the Internet on sites that also make money from use of those images through advertising; click bait, and other methods. These infringements were affecting our bottom line tremendously. We could no longer re-syndicate stories that had legally appeared in publications like the Daily Mail that were outright stolen by other news sites and websites around the world, because they had already been used illegally in similar markets.

10. In the past, whenever we had stories appear in major publications in one market, we would get "pickup requests" from publications in other markets. Attached hereto as Exhibit B is a true and correct copy of a major 6-page spread that I licensed to FHM Magazine in the UK for $8,000 as an example.[1] From this it is clear that worldwide syndication and multiple sales for

---

[1] Twenty other FHM's and one Maxim, plus some additional major markets called to license the same story from around the world, even in places like Thailand, Singapore, and Latvia. Each sale was an individual license tailored to their market, more than tripling the amount paid for the original story.

the story had been the backbone of my business.

11. Suddenly those resale requests trickled down to nearly nothing. That lost income would make it difficult for us to continue financing other projects.

12. This "digital riot" made it clear that our entire way of doing business was at stake, and as such, we turned our attention to the very labor-intense process of both protecting our copyrights and going after the infringers.

13. Further, the problem of pirated intellectual property was not just our problem, but had become endemic throughout our industry, and others.

14. At this point I decided to stop being victimized by the infringers and fight back. In 2014, I hired Brian R. Wolff of Intellectual Property, Inc. in Yardley, PA to assist me in this endeavor and also take over the licensing for Incredible Features, as my current staff had never experienced this problem on a big scale before. We were used to licensing our works, not handling multiple infringers. Wolff had the experience and knowledge to do both.

15. This was not my idea of a new business plan. On the contrary, this was an endeavor forced on us by the companies and individuals that are stealing works from my company and myself.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed on January 24, 2020 at Los Angeles, California.

/s/ Jeffrey R. Werner
Jeffrey R. Werner